IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

|                                                         |     |                                  |
| ------------------------------------------------------- | --- | -------------------------------- |
| PAUL MAYO                                                | )   |                                  |
|                                                         | )   |                                  |
| Plaintiff,                                              | )   |                                  |
|                                                         | )   |                                  |
| v.                                                      | )   | Civil Action No. 1:15-cv-00299   |
|                                                         | )   |                                  |
| GAYLE E. SMITH, *Administrator*                         | )   |                                  |
| *U.S. Agency for International*                         | )   |                                  |
| *Development*                                           | )   |                                  |
|                                                         | )   |                                  |
| Defendant.                                              | )   |                                  |
|                                                         | )   |                                  |

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment.

This is an employment discrimination case, whereby the Plaintiff alleges discrimination, harassment, and reprisal in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Rehabilitation Act, 29 U.S.C. § § 791 *et seq.*; the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq.*; and the Veterans Employment Opportunities Act ("VEOA"), 5 U.S.C. § 3330a *et seq.*

In 2010, when Plaintiff was sixty-seven year old, he applied for the position of Information Technology Specialist GS-2210-12, with the U.S. Agency for International Development's ("USAID")

Bureau for Management, Office of the Chief Information Officer ("M/CIO"). Plaintiff was telephonically interviewed by Jay Mahanand, then the Deputy CIO, and Patricia Krisotobek, head of the M/CIO Project Management Branch. The interview lasted approximately two hours and Plaintiff's military background, "entire history of working information technology," and his "life's story" were discussed. Plaintiff shared that he has a hearing disability and has difficulty hearing "conference calls in a big room." Accordingly, during the interview, Mahanand and Kristobek repositioned the telephone to accommodate Plaintiff's hearing. Plaintiff was offered the position, and he began his employment with USAID on February 28, 2011.

Section 508 of the Rehabilitation Act requires that federal agencies ensure that their electronic and information technology ("EIT") be comparably accessible to people with disabilities. In 2010, then CIO Jerry Horton became concerned with inquiries regarding USAID's Section 508 compliance, because the individual who answered such inquiries prior had retired. In order to prevent the role from slipping through the cracks again, in 2011, M/CIO Chief Information Security Officer and Chief Privacy Officer, William Morgan, volunteered to include the Section 508 initiative within his branch.

In or about June, 2011, Morgan, now USAID's Section 508 "Compliance Coordinator," became Plaintiff's supervisor, and

2

shortly thereafter assigned Plaintiff as the USAID Section 508 Compliance "Point of Contact" ("POC"). Plaintiff and Morgan met several times to discuss Section 508, and agreed to coordinate USAID's reporting, training, policies, and acquisitions. As POC, Plaintiff responded to inquiries concerning the "what, when, and why of Section 508," but otherwise considered himself as having "no responsibilities."

In or about mid-August 2011, Jeffrey Anouilh, M/CIO Deputy CIO, approached Plaintiff and informed him that M/CIO had training funds it needed to obligate and expend before the end of the Fiscal Year. Plaintiff identified training he desired to take, including three outside courses, each of which cost over $2,200.00. On August 18, 2011, Plaintiff and Morgan completed an "Individual Development Plan" ("IDP") which listed these courses. The IDP itself did not obligate M/CIO funds to be expended on these courses, and additional steps were necessary before the courses could be formally approved and attended. Nevertheless, Plaintiff attended one of these trainings, although M/CIO had neither paid, nor committed to pay, for the course.

In mid-October 2011, Morgan, Anouilh, and Stephen Polkinghorn discovered Plaintiff's lapse. Because M/CIO had obligated funds to pay for Plaintiff's second requested training, Morgan instructed Polkinghorn to use those funds to retroactively pay for the course already taken. Due to insufficient

3

departmental funds, Plaintiff was not permitted to take either of the other courses.

Shortly after he started with USAID, Plaintiff began seeking promotions within M/CIO, none of which involved Section 508. There are many ways that an agency fills its vacancies. See 5 C.F.R. § 330.102. USAID, however, has an Interagency Delegated Examining Agreement with the Office of Personnel Management ("OPM"), which means that OPM has delegated to USAID the authority to conduct competitive examinations for positions at USAID.

When USAID advertises a given vacancy, it will typically post several related "listings," each one stating a specific area of consideration. As relevant here, for example, a single vacancy may be posted simultaneously under (1) a "Delegated Examining" ("DE") announcement, open to all U.S. citizens; (2) a "Merit Promotion" ("MP") announcement, which is open only to "status eligible" candidates (meaning candidates who are current or former federal employees who hold or held non-temporary appointments in the competitive service); and (3) a "Non-Competitive" announcement, which is likewise open to current or former federal employees, with the distinction that such employees are already at the grade carried by the vacancy.

Before announcing a vacancy, the selecting official will work with staff in USAID's Human Resources ("HR") Office to

develop a job-related occupational questionnaire, which allows the applicant to self-assess his qualifications for the position. Based on an applicant's self-evaluated answers, USAID's web-based application for processing and evaluating applications, Monster, will assign the applicant a score.

For DE openings, USAID employs "category rating," by which applicants who meet the requirements for the position are placed into one of three quality categories: gold (90-100 points); silver (80- 89.99); and bronze (70-79.99 points). Generally, only candidates in the "gold" category are placed on the DE "referral list," which is the list of qualified candidates that is forwarded to the selecting official for consideration. Merit Promotion and Non-Competitive vacancies follow a similar, but distinct, process. Monster likewise generates MP and NC "referral lists," but employs a "natural break" as the "cut-off" score. This break is often set at 90 points.

Although USAID conducts its own recruitment and staffing, from July 14, 2011 to September 30, 2012, OPM assisted USAID with certain aspects of the process because USAID was transitioning to the Monster application process.

In August 2011, Plaintiff applied for job announcement No. AN520024, IT Project Manager GS-2210-14, on USAJOBS.gov. The position required a minimum of one year "specialized experience" as a project manager "managing large, complex, enterprise level

IT projects." Kristobek served as the selecting official for AN520024, and was assisted by subject matter expert Sandy Muldoon Kunz. Kristobek reviewed Plaintiff's application and determined he had no experience as a project manager; rather, he had only supported project managers in their work. Further, Kristobek correctly understood Plaintiff never undertook any continuing education after earning his project manager certification in 1994. On September 12, 2011, Kunz emailed USAID Human Resources Specialist Linda Wilson for guidance on the appropriate use of the three employment eligible certification lists provided by OPM for AN520024. Although Plaintiff appeared on the DE and the non-competitive list, Wilson informed Kunz she was not required to interview Plaintiff.

Kristobek ultimately selected Wayne Driver and Barry Richardson from the OPM merit promotion list, and Nestor Bonilla from the OPM DE list, for this position. Driver was an IT professional with federal experience as project manager, Richardson was a veteran with more than five years' experience as a senior IT project manager, and Bonilla was a veteran with experience as an IT project manager.

At his deposition, Plaintiff testified that he had no basis to believe that he was better qualified for the position than the persons who were selected, that he had "no clue" about why he was not himself selected, and that he did not believe that his

6

Section 508 activities "affected [Kristobek] at all" in her decision not to select him for the position.

In September 2011, Plaintiff applied for the vacancy announced by AN517802, IT Specialist (Systems Analysis) GS-2210-14. This position involved performance of "network management, server management, application design and architecture, [and] hardware support," specifically of mobile devices for M/CIO's Operations and Maintenance Division. The selecting official was Sukvinder Singh.

After reviewing the relevant certification lists, Singh determined no candidate was qualified and he did not interview or select anyone for the position. Singh's decision was based entirely on the candidates' resumes and responses to the KSA questions he had crafted. Singh determined Plaintiff, in particular, did not have the requisite technical experience in "supporting Blackberry exchange servers, network infrastructure including Cisco networks ... [and] support for domain name servers."

In or around late March 2013, Plaintiff applied for a GS-14 IT Specialist position with M/CIO's Data Management division. The posting was advertised under two announcements, a DE list and a separate merit promotion list. Paul Eavy, who was then a Supervisory IT Specialist at USAID, M/CIO, was the selecting official for this position. With the benefit of his Veterans'

preference, Plaintiff appeared on the DE list for this vacancy; however, without the benefit of that preference, he did not appear on the MP list for the same. Although Eavy does not recall receiving the DE list at any point, records maintained by the Monster application indicate that he did in fact receive this list, but did not deem any of the candidates on that list, including Plaintiff, to be qualified for the position. Eavy ultimately selected and hired two candidates from the MP list (on which Plaintiff did not appear) - Imtiaz Merchant and Zakir Hossain, both of whom had extensive relevant experience. At his deposition, Plaintiff conceded that he had no basis to believe that he was better qualified for the position than either Merchant or Hossain.

In February 2014, Sharon Robinson, who had been promoted to Supervisory IT Specialist under Morgan, informed Plaintiff that he would not be approved for certain project management training because it was not related to Plaintiff's scope of work, and because it did not fall within the project manager discipline. Plaintiff testified at his deposition that his role as Section 508 POC was not project management because "there is no project" and he had never worked as a project manager anywhere. During the course of his tenure at USAID, Plaintiff requested and was granted, or self-assigned, dozens of other trainings.

In March 2014, Morgan requested that Plaintiff provide him

with a Statement of Work ("SOW") concerning his Section 508 duties, so that USAID could hire a contractor to support him. Plaintiff informed Morgan that he believed the contract solicitation was legally flawed, but did not inform Morgan that he considered the SOW request itself to be harassing. Plaintiff eventually provided a SOW that Morgan found insufficient. Nevertheless, in late 2014, USAID hired a contractor to assist Plaintiff with his responsibilities.

Although USAID employees are generally assigned to a personal workstation containing a computer, the employee's computer belongs to USAID, and in accordance with agency policy, the employee has no privacy right to any information or files he may store on that computer. In addition, USAID employees are permitted to access the agency's network from computers located in any workstation, and to use software that may only be available at a different workstation. However, when an employee logs on to another employee's computer using his own account information, he merely accesses his own account through a different computer. In order to access another employee's account, the user's password or authorization from the forensics team is required.

In March 2014, Anouilh, responding to a last-minute request of CIO Mahanand, used the computer at Plaintiff's workstation to print a Section 508 scan using software only available on that

computer. Plaintiff was informed by a co-worker that she had seen Anouilh and Milne using his computer. Although Plaintiff did not believe Anouilh or Milne accessed his computer to harass him or retaliate against him for any reason, he assumed that his coworkers copied his files. Plaintiff did not ask Robinson, Morgan, Anouilh, or Milne about this event, but instead immediately emailed a complaint to the FBI regarding the same.

When Mahanand became CIO in 2014, he assigned the Section 508 responsibilities to a specific manager, and formally named Morgan Section 508 Coordinator. Accordingly, Plaintiff's 2014 draft Annual Evaluation Form ("AEF") corrected former references to him as Section 508 Coordinator, and accurately listed him as only the POC. Throughout 2014, Plaintiff disagreed with M/CIO supervisors regarding his 2014 draft AEF. Specifically, Plaintiff took issue with his managers' proposal to add the following performance element to his assigned duties: "[r]eview a sample of a minimum of 25 IT contract solicitations or proposals throughout the Agency, for appropriate Section 508 contract language, document findings and report during weekly [departmental] meetings." Plaintiff's managers intended that Plaintiff review twenty-five solicitations throughout the year, whereas Plaintiff interpreted the language as requiring him to review twenty-five contracts per week. Plaintiff refused to either discuss his concerns with Robinson, or sign the AEF.

Accordingly, pursuant to USAID policy and procedures, an appraisal committee ("AC") was assigned to review Plaintiff's AEF. The AC reviews and signs performance plans and ensures performance standards are reasonable. After reviewing the AEF, the AC found "no major conflicts with the performance plan," and did not see why the "Rating Official and Employee could not agree to the plan." After edits for clarification and an enlargement of the rating period, the AC signed Plaintiff's AEF in his place.

USAID Operation Policy Guidance ("ADS") Chapter 405 governs the agency's employee telework program. Section 405.2(c) specifies that "[e]mployees are responsible for accounting for what they have accomplished on a telework day," and subsection (d) establishes that first-line supervisors are "responsible for evaluating their employees' productivity for the time spent teleworking." Also, ADS 405.3.12 states that "[s]upervisors must be kept apprised of the teleworking employee's schedule and the status of all pending work assignments." Plaintiff was first approved for telework privileges in May 2011, shortly after he began working for USAID.

As a first-line supervisor, Robinson followed ADS 405 guidance by requiring daily updates on work accomplished during telework from all team members. Plaintiff teleworked under Robinson's supervision since 2012, and was made aware of the reporting requirements individually and as part of the team. In

an effort to remind her team to report daily telework activities, Robinson sent a team email on April 10, 2014. Plaintiff alleges these e-mail reminders to be harassing.

In April 2015, during an in-person, thirty-minute conversation with Morgan, Plaintiff's telework agreement was rescinded due to his failure to provide information concerning his telework activities and issues completing work assignments. After the meeting, Morgan identified three specific Section 508 tasks Plaintiff had failed to accomplish.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings and evidence before the Court show no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is not a "disfavored procedural shortcut, but rather [an] integral part of the Federal Rules ... which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Id. While the Court will view the facts and inferences drawn in the light most favorable to the nonmoving party, the party opposing the motion for summary judgment must put forth specific facts showing a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[I]t is ultimately the nonmovant's burden to persuade us that there is indeed a dispute

of material fact. It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." Design Res., Inc. v. Leather Indus. Of Am., 789 F.3d 495, 500 (4th Cir. 2015) (citations and quotations omitted).

The Court must analyze Plaintiff's claims of discrimination, based on age and disability, and retaliation under the well-known McDonnell Douglas burden-shifting framework. See generally McDonnell Douglas Corp. v. Green, 411 U.S. 792 91973); see also Laber v. Harvey, 438 F.3d 404, 430, 432 (4th Cir. 2006); Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995). Under this framework, first, a plaintiff must state a prima facie case of either status-based discrimination or retaliation. Laber, 438 F.3d at 430-31. Second, if the plaintiff succeeds in stating a prima facie case, a burden of production, but not of proof or persuasion, shifts to the defendant to articulate a legitimate, non-discriminatory (or non-retaliatory) reason for the adverse employment action. Id. Third, if the employer makes this showing, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported ... reasons 'were not its true reasons, but were a pretext for discrimination.'" Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 250 (4th Cir. 2015). (internal citation omitted). Importantly, and as the Fourth

Circuit recently confirmed, in order to prevail at the "pretext stage," a plaintiff must demonstrate that intentional discrimination or retaliation was "the real reason," which is to say, the "but-for cause" of the challenged employment action. Foster, 787 F.3d at 252.

Insofar as Plaintiff's claims assert unlawful discrimination based on age and/or disability, his *prima facie* case consists of demonstrating that:

> (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse action, he was performing his job at a level that met his employer's legitimate expectations and was qualified for the promotion; and (4) [the adverse employment action occurred] under circumstances giving rise to an inference of unlawful discrimination.

Adams v. Trustees of the Univ. of N.C. Wilmington, 640 F.3d 550, 558 (4th Cir. 2011).

In addition, for age discrimination claims, a plaintiff must additionally demonstrate that "the position [applied for] ... was filled by a similarly qualified applicant who was substantially younger than the plaintiff, whether within or outside the class protected by the ADEA." Laber, 438 F.3d at 430.

With respect to the second element of this framework, for purposes of a discrimination claim, an "adverse employment action" is one that "'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment,'" such that the employee suffers "some significant detrimental effect" from the

14

action in question. Holland v. Wash. Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004)). Examples of this type of action include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999).

For Plaintiff's retaliation claims, his *prima facie* case consists of demonstrating that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link between the protected activity and the employment action. Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001);[1] Gomez-Perez v. Potter, 553 U.S. 474 (2008) (inferring a retaliation claim in the federal sector ADEA provision). With respect to the adverse employment action requirement in the retaliation context, the Supreme Court has held that, at least for private-sector employees, an "adverse employment action" is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68 (2006) (internal citation omitted); see also Harman v. Unisys, 356 F. App'x 638, 641 (4th Cir. 2009) (unpublished) (applying White to private-

---

[1] Although the Rehabilitation Act does not have a specific retaliation provision, it incorporates the remedies applicable under the ADA, which does include such a provision. 29 U.S.C. § 791(g); 42 U.S.C. § 12203(a).

sector ADEA claims).

Plaintiff cannot establish a triable claim of either discrimination or retaliation for any of his non-selections for promotion. The record reflects that Plaintiff was not qualified for any of the positions he sought and has testified that he had no basis to assess the qualifications of the other candidates. These deficiencies are fatal to both the third and fourth prongs of his *prima facie* claims of discrimination. See Adams, 640 F.3d at 558 ("qualifi[cation] for the promotion" in question and "circumstances giving rise to an inference of unlawful discrimination" are necessary elements of a *prima facie* claim of discrimination).

First, regarding the vacancy announced by AN520024, the record plainly establishes that Kristobek did not select Plaintiff for the position because he had no project manager experience, which was an express requirement for the position. Further, at his deposition, Plaintiff expressly conceded that he had no basis to believe that he was better qualified for the position than the persons who were selected, and that he had "no clue" about why he was not himself selected. These concessions, combined with Plaintiff's lack of the requisite project management experience, preclude any establishment of a *prima facie* case of discrimination.

Similarly, the record further reflects that both Singh and

16

Eavy permissibly reached similar conclusions regarding Plaintiff's lack of qualifications for the 517802 and 13-0131 positions. With respect to the former, Singh sought a candidate with experience supporting Blackberry exchange servers, among other specific qualifications. With respect to the latter, Plaintiff again expressly conceded that he had absolutely no basis to believe that he was better qualified than Mr. Eavy's selectees, an admission that, at minimum, dooms his ability to demonstrate the presence of "circumstances giving rise to an inference of unlawful discrimination," as required to establish a *prima facie* case. See Adams, 640 F.3d at 558.

Plaintiff's Complaint also references other allegedly discriminatory non-selections. Plaintiff, however, fails to demonstrate that he was qualified for these positions, that his non-selection was occasioned under discriminatory circumstances, or that there exists a causal nexus to discrimination or retaliation related to these decisions. Thus, for the exact same reasons as set forth above, Plaintiff cannot establish, for any of these non-selections, any "causal link" between any protected activity and the non-selection, as required to establish a *prima facie* case of retaliation. Hooven-Lewis, 249 F.3d at 272.

Assuming that Plaintiff could establish a *prima facie* case with respect to any of these non-selections, he still cannot establish a triable issue of pretext.

"[P]retext may be inferred," at least in "certain circumstances," "from a showing that a plaintiff in a protected class was the better qualified candidate when compared to the person selected from outside the protected class." Calobrisi v. Booz Allen Hamilton, Inc., 2015 WL 1349627, at *5 (E.D. Va. Mar. 24, 2015). However, the qualifications gap must be "substantial," Ham v. Wash. Suburban Sanitary Comm'n, 158 Fed. Appx. 457, 464 (4th Cir. 2005), and "it is the perception of the decision maker" – not the employee — "which is relevant." Calobrisi, 2015 WL 1349627, at *5. Plaintiff simply cannot meet this burden because the record establishes that he was not qualified for the positions in question. Further, Plaintiff admittedly had no basis to contend that he was better qualified than any of the ultimate selectees, other than a subjective belief that he should have been selected. This is simply not enough to show pretext.

As it pertains to Plaintiff's allegations relating to denial of training, numerous courts have held that mere denial of a training opportunity is not a sufficiently adverse employment action to satisfy the plaintiff's initial prima facie burden, particularly where there is not a clear nexus between the denial of training and the employees ability to perform his job functions, receive pay increases, or advance his career. See James, 368 F.3d at 376-77. Particularly with respect to Plaintiff's 2011 training requests, Plaintiff has not alleged nor

demonstrated that the training he failed to receive rose to the level necessary to establish an "adverse employment action."

Regarding the alleged denial of the project management training, Plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination. Thompson v. Potomac Electric Power Co., 312 F.3d 645, 649–50 (4th Cir. 2002). The record indicates that Plaintiff's job, including others on his team, did not merit project management training, and Plaintiff's managers therefore properly deemed him ineligible for such training. There is nothing in the record to indicate discriminatory intent or pretext.

With respect to Plaintiff's partial approval for training in 2011, the record reflects that USAID expended in excess of $2,000.00 for Plaintiff to take an external training, and there is nothing in the record to suggest that USAID's decision was for anything other than neutral, budgetary reasons. Moreover, during his tenure at USAID, Plaintiff's managers allowed Plaintiff ample opportunities to attend other trainings that were both relevant to his job and free. Plaintiff simply cannot show pretext.

Plaintiff's hostile work environment claim similarly lacks merit. As the Fourth Circuit has held, to establish a hostile

work environment claim, a plaintiff must demonstrate that the alleged conduct: (1) was unwelcome; (2) resulted because of ... disability, or prior protected activity; (3) was sufficiently severe or pervasive to alter the conditions of employment; and (4) was imputable to [the] employer. Pueschel v. Peters, 577 F.3d 558, 564 565 (4th Cir. 2009) (internal citations omitted); see also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (ADEA). The determination of hostility depends on whether a reasonable person would find the work environment to be hostile and whether Plaintiff subjectively perceived it to be so. Id. Viable hostile work environment claims often involve repeated objectively abusive conduct; thus minor incidents, even in the aggregate, do not merit relief. Id.

Plaintiff complains that issues with his Section 508 duties form the basis of a hostile work environment claim. Specifically, he alleges that his position description was not changed and he was refused the title of coordinator. However, Plaintiff admits that no one ever criticized him for his Section 508 activities and he fails to identify a single supervisor that retaliated against him. Further, Plaintiff acknowledges he always understood Morgan to be the Section 508 Coordinator, and believed himself to have no Section 508 "responsibilities." Accordingly, Defendant has not "continued to harass [Plaintiff] by not giving him the title, resources and actual authority" for Section 508, where

Plaintiff never had any expectation of such.

Plaintiff claims that a statement by Horton that he would not assign a coordinator because the individual "wouldn't be around long" is not enough to show a hostile work environment. There is nothing embedded in this simple statement that reflects any animus against the Plaintiff. In any event, "isolated and ambiguous statements ... 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.'" O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 546, 548-49 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996) (citation omitted).

It is not enough to allege what seems to be a series of unrelated, uncomfortable work experiences involving a number of USAID employees from various backgrounds. There is simply no evidence of a hostile work environment.

For the foregoing reasons, Defendant's Motions for Summary Judgment should be granted.

An appropriate order shall issue.

*Claude M. Hilton*

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
May 16, 2016